## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BLUEFIELD DIVISION

**SUSAN ELAINE KECZAN I,**

    **Plaintiff,**

**vs.**                                                     **CIVIL ACTION NO. 1:16-02057**

**CAROLYN W. COLVIN**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

    **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Presently pending before the Court are parties' cross-motions for Judgment on the Pleadings. (Document Nos. 13 and 15.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 3 and 4.)

The Plaintiff, Susan Elaine Keczan I, hereinafter "Claimant", filed an application for DIB benefits on February 11, 2013, alleging disability since October 5, 2005, due to "chronic fibromyalgia, degenerative disc disease, arthritis, chronic depression, torn rotator cuff, problems in my right hip, plates in my left leg and in my right arm, problems with the disc in my neck, problems with my bladder holding urine".[1] (Tr. at 148.) Claimant's application was denied initially

---

[1] On her form Disability Report – Appeal, submitted on April 29, 2013, Claimant asserted that since her last disability report dated February 22, 2013, "the joints in both my hands (worse in the right hand) hurt more and they draw up; my right hip hurts more; my back hurts; I have a plate in my left leg and it hurts more; I get anxious doing anything outside of house" also, Claimant asserted "I can't do dishes; I can't peel potatoes; I can't do any housework; I can't do my hair; I can't lift or pull; I can't stand long; I can't walk any distances; can't sleep". (Tr. at 167.) She submitted

and upon reconsideration. (Tr. at 74, 84.) On August 8, 2013, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 91-92.) A hearing was held on September 4, 2014, before the Honorable Jeffrey J. Schueler. (Tr. at 22-58.) The ALJ denied her claim by decision dated October 31, 2014. (Tr. at 7-21.) The ALJ's decision became the final decision of the Commissioner on February 18, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On March 3, 2016, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id.

---

another Disability Report – Appeal on August 7, 2013 alleging that "[m]y memory is worse, can't remember anything. I have more anxiety and am more depressed; my back and hip hurt more" and that "I can't stand very long at all; I walk 10 minutes and have to stop and rest; I can't drive, my husband and my doctor have forbidden me to." (Tr. at 191.)

§ 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such

>factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
>(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
>(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

In this particular case, the ALJ determined that Claimant last met the insured status requirements of the Social Security Act on December 31, 2011, her date last insured ("DLI"). (Tr. at 12, Finding No. 1.) The ALJ then found that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, October 5, 2005 through DLI. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments through DLI: hypertension; cervical and lumbar degenerative changes; right shoulder rotator cuff tear; major depressive disorder; anxiety disorder; and opiate dependence in remission. (Tr. at 13, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light work:

> However, the claimant can never climb ladders, ropes, or scaffolds, can occasionally climb ramps or stairs, balance, kneel, stoop, crawl, or crouch, and should avoid concentrated exposure to hazards. She can frequently reach, handle,

> and finger objects, but can only occasionally overhead reach. She requires a low-stress job (defined as requiring only occasional decision making or changes in the work setting) with occasional interaction with the public or co-workers.

(Tr. at 17, Finding No. 5.) At step four, the ALJ found that Claimant was incapable of performing past relevant work as a paralegal. (Tr. at 20, Finding No. 6.) At step five, the ALJ found that Claimant was born on January 21, 1962 and was 49 years of age, making her a younger individual on her DLI, and that she has a high school education with college study in the paralegal field and able to communicate in English. (Id., Finding Nos. 7 and 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled though DLI, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and RFC indicated that there were other jobs existing in significant numbers in the national economy that Claimant could have performed. (Id., Finding Nos. 9 and 10.) On this basis, benefits were denied. (Tr. at 21, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize

the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on January 21, 1962, and was 49 years old on her DLI, December 31, 2011. (Tr. at 20.) Claimant has a high school education, and obtained a degree from Mountain State University to become a paralegal. (Tr. at 28.) Claimant worked as a paralegal/office manager/secretary for two sets of attorneys for many years, which entailed typing pleadings, taking care of personal assets, running the office, scheduling appointments, maintaining case files and client funds. (Tr. at 29-30.) Claimant developed health problems and subsequently left her employment, and soon after was indicted by the Mercer County Grand Jury for 94 counts embezzlement by a local attorney for whom she previously worked. (Tr. at 32-34.) The charges were all dismissed and the attorney had his license suspended, however, Claimant has not "gotten over this." (Tr. at 34-36.)

Issues on Appeal

Claimant alleges a single ground in support of her appeal: that the ALJ erred when he failed to find fibromyalgia as a severe impairment, resulting in a flawed RFC assessment because it does not consider the symptoms associated with this impairment. (Document No. 13 at 4.)

The Relevant Evidence of Record[3]

The Court has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

Medical Records:

On July 19, 2006, Clamant presented to the Bluefield Regional Medical Center emergency room complaining of left lower quadrant pain (Tr. at 223.); she returned to the hospital on October 24, 2006 due to right lower quadrant pain. (Tr. at 224.) Due to her reports of chronic abdominal pain, she underwent a number of procedures, including a hysterectomy and subsequent excision of an ovarian cyst by Dr. Bruce Lasker. (Tr. at 211, 219, 227, 230.)

On March 24, 2008, Claimant was seen by Dr. Joseph P. Lemmer (Tr. at 210); Dr. Lasker had requested the evaluation because of Claimant's complaints of generalized myalgias and arthralgias. (Tr. at 211). Claimant reported that she had experienced a back injury in her youth, for which she did not seek any treatment; during the examination, she reported pain in her right hip, right leg, right wrist, buttock, and low back. (Id.) She also reported some right-leg numbness, fatigue, and weakness, as well as mild swelling in her left ankle, but no other swelling. (Id.) Dr. Lemmer assessed moderate tenderness in Claimant's spine, elbows, knees, and elsewhere; Claimant exhibited full range of motion in her joints, and she had no deformities, cyanosis, or edema in her extremities. (Tr. at 212-213.) Dr. Lemmer's primary prognosis was "myalgias and arthralgias with tender points most consistent with fibromyalgia syndrome"; Dr. Lemmer prescribed Lortab and discussed with Claimant the relationship of pain to poor sleep, stress, and lack of exercise. (Tr. at 213.)

On December 8, 2008, Claimant was admitted to the Bluefield Regional Medical Center emergency room with body aches and complaining of chronic back pain. (Tr. at 231.) She reported having run out of medication, Ativan and Percocet, two days prior. (Id.) Andrew Cook, D.O., found no cyanosis or clubbing in her extremities, and she exhibited no edema; Dr. Cook further

noted nothing suggestive of an acute neurologic, cardiac, pulmonary, or abdominal process, opining that Claimant's symptoms were likely secondary to drug withdrawal. (Tr. at 232.) Dr. Cook educated Claimant about the potential for liver complications, but he felt that her condition did not warrant methadone treatment at this time. (Tr. at 232-233.) Claimant discharged from the emergency room in stable condition; the diagnoses at that time included chronic pain, drug abuse, and drug withdrawal. (Tr. at 233.)

Due to her complaints of neck pain lasting six to seven months, on January 7, 2009 an MRI was taken of Claimant's cervical spine that showed a mild broad-based posterior disc bulge at the upper levels without neural foraminal encroachment or stenosis. (Tr. at 217.) On January 12, 2009, Claimant returned to the Bluefield Regional Medical Center emergency room after losing her footing and falling. (Tr. at 235.) She reported that she did not lose consciousness, but she did exhibit pain on range of motion of her shoulder. (Id.) A right-wrist x-ray showed a distal radius fracture, though her right elbow was normal. (Tr. at 243-244.) Claimant subsequently underwent an open reduction internal fixation of her right distal radius. (Tr. at 234.) A follow-up x-ray several months later showed the fracture stabilized with hardware. (Tr. at 246.)

On June 30, 2009, Claimant was admitted to the Beckley Appalachian Regional Hospital stating that she had been cut off from pain medication and wanted to undergo detoxification. (Tr. at 368.) She subsequently admitted that she was receiving Percocet and Ativan from both her family doctor and a pain management clinic, and she had been abusing the medication for four or five months. (Tr. at 429.) After discontinuing the medication, she was experiencing withdrawal symptoms such as body aches, chills, and diarrhea, and she reported pain that she rated as 8 out of 10. (Tr. at 368-369.) On examination, Claimant's skin, back, cranial nerves, and gait were normal.

(Tr. at 367.) A functional screening indicated that she was independent in her activities of daily living. (Tr. at 369.) That same day, the emergency room referred Claimant to see psychiatrist M. Khalid Hasan, M.D., who noted her reported past medical history, including chronic pain due to degenerative disc disease and fibromyalgia. (Tr. at 429.) Dr. Hasan diagnosed Claimant with substance abuse, mixed type, substance abuse mood disorder, and chronic pain syndrome. (Tr. at 430.)

Due to Claimant's complaints of neck pain and right shoulder pain, on September 12, 2009, an MRI of her right shoulder showed a full-thickness focal tear of her distal supraspinatus tendon, with tendinopathy there and in her infraspinatus tendon; an MRI of her cervical spine was unremarkable. (Tr. at 247, 249.) Due to Claimant's complaints of right hip pain and low back pain radiating down right leg, on October 3, 2009, a lumbar MRI showed early degenerative disc disease at L5-S1, without significant canal or foraminal compromise. (Tr. at 250.) An MRI of her hips showed a grade one-two right hip effusion, with a grade one left hip effusion, but no demonstrable greater trochanteric bursitis. (Tr. at 251.)

On December 28, 2009, Claimant returned to Beckley Appalachian Regional Hospital reporting epigastric pain, and that she was out of Ativan; a functional screening indicated that she was independent in her activities of daily living. (Tr. at 341.) On examination, her back and skin reportedly remained normal, with intact cranial nerves. (Tr. at 339.)

A treatment note dated October 6, 2011 from Claimant's psychiatrist, Omar K. Hasan, M.D.[4], indicated that he anticipated tapering her medication (Tr. at 422.), however, by October 17, 2011, it was noted that Claimant reported nausea and sweating and she stated she was not handling

---

[4] The record indicates that Omar K. Hasan, M.D. and M. Khalid Hasan, M.D. have a medical practice called Raleigh Psychiatric Services, Inc. in Beckley, West Virginia. (Tr. at 384.)

the decrease in her medication well. (Tr. at 420.)

On April 5, 2013, Claimant returned to Family Medical Clinic in Bluefield, West Virginia; it was noted that she was last seen in November 2009. (Tr. at 378.) An osteopathic musculoskeletal examination performed by "Dr. Yates" indicated that Claimant exhibited questionable tremors, a flat affect, and normal range of motion; she had no edema, cyanosis or clubbing in her extremities, and the severity of her neck, thoracic spine, lumbar spine, and pelvic issues were rated 1 out of 3. (Tr. at 378-379.)

In September 2013, Claimant established Jonathan Yates, D.O. as her primary care physician (Tr. at 475.) She complained of pain in her neck that felt like it was constantly burning at nighttime, as well as pain in her hands, and hip pain that became "so very severe at times" that it interfered with her walking, activities of daily living, etc. (Tr. at 476.) In his physical examination, he reported painful areas that were consistent with fibromyalgia. (Tr. at 477.) Dr. Yates's diagnoses included myalgia and myositis, unspecified, and referred Claimant to the Pain Clinic; Dr. Yates also diagnosed pain in the joint, pelvic region and thigh and planned to get an MRI approved. (Tr. at 478.) A follow up treatment note dated November 18, 2013 indicated that Dr. Yates assessed Claimant with fibromyositus and was referred to the Pain Clinic. (Tr. at 482.) On February 17, 2014, Dr. Yates continued to report Claimant's "painful areas that are consistent with fibromyalgia" (Tr. at 485.) for which Claimant was being followed at the Pain Clinic. (Tr. at 486.)

<u>Dr. Jonathan Yates Medical Source Statement:</u>

On July 7, 2014, Dr. Yates completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) form. (Tr. at 505-507.) Dr. Yates also checked-off entries indicating

that Claimant could occasionally lift/carry 10 pounds; frequently lift/carry less than 10 pounds; stand/walk less than 2 hours per day, and no more than 15 minutes without changing positions; sit less than 2 hours per day, and no more than 15 minutes without changing positions; needed the opportunity to change at will between sitting and standing positions; could never climb, balance, stoop, crouch, kneel, or crawl; that her reaching, handling, feeling, pushing, and pulling abilities were affected by her impairments; that she had difficulty walking; and that she would be absent from work more than three times per month. (Tr. at 505-507.)

In support of his opinion, Dr. Yates noted Claimant's "chronic pain [secondary] to fibromyalgia, osteoarthritis, [and] deg[enerative] disc disease" and further opined that, "[a]mbulating steps [is] very difficult" due to "[s]evere hip/pelvic pain, neck pain, [and] generalized muscle pain". (Tr. at 506.) Dr. Yates further opined that Claimant's capabilities in reaching, handling, feeling, and pushing/pulling were affected by her impairment. (Id.) Dr. Yates observed that Claimant had "[d]ifficulty walking at appointment, getting onto exam table" and that her complaints were credible and based his responses on his own findings and conclusions as opposed to Claimant's self-reporting. (Tr. at 507.) Dr. Yates described having begun treating Claimant in April 2009, and that her "symptoms have only progressed with time" and that her "long term prognosis is poor". (Id.)

Function Report – Adult:

Claimant reported activities such as preparing meals, doing laundry, performing light dusting, caring for her dogs, shopping via the computer, and reading. (Tr. at 183-185.)

The Administrative Hearing:

The ALJ asked vocational expert ("VE"), Ashley Wells, to consider a hypothetical

individual with Claimant's vocational profile who could perform light work, involving lifting and carrying up to 20 pounds occasionally and 10 pounds frequently, and standing/walking and sitting for 6 hours per day; could never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crawl, crouch, and climb ramps and stairs; should avoid concentrated exposure to hazards (such as moving machinery or heights); and required a low-stress job (involving only occasional decision making or changes in the work setting), with no more than occasional interaction with the public or coworkers. (Tr. at 48-49.) The VE responded that the hypothetical individual could perform the representative jobs of a night cleaner or mail clerk. (Tr. at 49-50.)

Claimant's Challenges to the Commissioner's Decision

Claimant contends her fibromyalgia existed before her DLI and her physician, Dr. Yates, who had treated her since 2009 had completed a medical source statement that her symptoms due to fibromyalgia precluded employment. (Document No. 13 at 5.) The ALJ failed to consider Claimant's limitations associated with this impairment in his RFC assessment; moreover, the ALJ crafted the RFC based on limitations he created himself, and were not based on identifiable medical evidence of record, thereby preventing meaningful judicial review. (Id. at 6.) Finally, by failing to include Claimant's fibromyalgia as a severe impairment, the ALJ gave no weight to Dr. Yates's opinion, resulting in a decision unsupported by substantial evidence. (Id. at 6-7.) Claimant prays this Court reverse the Commissioner's decision and that she be awarded benefits. (Id. at 7.)

In response, the Commissioner argues the ALJ found severe impairments at step two, and the RFC assessment is not dependent upon the severe and non-severe classification of impairment, therefore, even assuming the ALJ erred in finding fibromyalgia was not a severe impairment, it

would be deemed harmless error. (Document No. 15 at 9.) Further, the ALJ reviewed the evidence of record concerning Claimant's conservative treatment for fibromyalgia, and there was no evidence supporting that this diagnosis caused her any functional limitation during the relevant time period, from October 5, 2005 through and concluding on December 31, 2011. (Id. at 10-12.) The Commissioner contends that pursuant to the Regulations, the ALJ properly afforded no weight to Dr. Yates's opinion, which was rendered two and a half years after Claimant's DLI, noting that it was not supported by clinical evidence, and did not purport to apply to the relevant time period. (Id. at 13-14.) Moreover, the Commissioner argues that the ALJ is not required to obtain a medical opinion as to Claimant's RFC so long as it is supported by objective medical findings and facts, which was done here. (Id. at 14-15.) Finally, the Commissioner states that Claimant failed to demonstrate prejudicial legal error in support of her appeal; the ALJ's decision is supported by substantial evidence and should be affirmed. (Id. at 15-16.)

Analysis

### Fibromyalgia as Severe Impairment:

Obviously, the ALJ did not find fibromyalgia as one of Claimant's severe impairments, indeed, no medical records pertaining to fibromyalgia are noted in the decision. Fibromyalgia was mentioned once during the administrative hearing, specifically, Claimant testified that it bothered her hips, hands and neck. (Tr. at 41.) Claimant testified that she gained weight since she stopped working, but she quit being active due to pain, and used a hot tub to help with pain control; she also testified that walking, standing to do dishes, raising her arms above her head, and sitting were difficult. (Tr. at 41-42.) Claimant stated that she had these symptoms since before 2009 and it became worse. (Tr. at 43.)

After thorough review of the written decision as well as the Claimant's testimony, her claim appeared primarily based on mental impairments due to her indictment for embezzlement, an experience Claimant described as "my world ended the day I got indicted." (Tr. at 18, 39.) Nevertheless, the ALJ's failure to address fibromyalgia as an impairment, severe or not, was in error because there was evidence concerning this impairment during the relevant time period. In 2008, Dr. Lemmer found her symptoms consistent with fibromyalgia (Tr. at 213.), and that was corroborated by her testimony.[5] Therefore, the undersigned finds that not addressing fibromyalgia at all in the written decision was error.

Evaluation of Opinion Evidence:

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(c)(2)[6]. The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. Id. Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to

---

[5] The undersigned notes that Claimant actually listed "chronic fibromyalgia" twice in her initial application, as the first and second conditions that limit her ability to work. (Tr. at 148.)
[6] It is noted that the ALJ referenced this Regulation in the written decision. (Tr. at 17.)

determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

Dr. Yates became Claimant's primary care physician in September 2013, *supra*. The record shows that there was a treatment gap for nearly three and a half years (November 2009 to April 2013), however, the record indicates that Claimant received regular treatment after she reestablished contact with Dr. Yates in April 2013. The ALJ gave no weight to Dr. Yates's July 7, 2014 opinion. (Tr. at 19.) Due to the ALJ's failure to mention fibromyalgia in his decision, a condition for which Dr. Yates had treated Claimant for several years according to his medical source statement, the undersigned finds that the ALJ improperly evaluated this medical opinion evidence on the sole basis that the ALJ failed to address fibromyalgia at all, rendering the decision not "rational". Oppenheim at 397.

RFC Assessment:

With regard to the ALJ's RFC assessment, the aforementioned findings necessarily dictates that any limitations from fibromyalgia should have been addressed. An RFC determination is based "on all the relevant evidence in [the] case record", which includes "relevant medical and other evidence" as well as "statements about what [the claimant] can still do", "descriptions and observations of [the claimant's] limitations . . . provided by [the claimant] . . . [.]" See 20 C.F.R. § 404.1545(a)(1), (a)(3) (emphasis added) The undersigned notes that a medical opinion is not necessary in formulating a claimant's RFC, however, the Regulations and controlling law are clear that the Commissioner is obligated to consider "all" the evidence in the record. Colvard v. Chater, 59 F.3d 165 (4th Cir. 1995) ("The determination of a claimant's [RFC] lies with the ALJ, not a physician, and is based upon all relevant evidence.") (emphasis added) There was evidence of

fibromyalgia symptoms prior to Claimant's DLI, which remained consistent afterwards. Pursuant to the aforementioned Regulations, the ALJ was obligated to consider Claimant's fibromyalgia as well as any limitations associated as a result of this condition. Accordingly, the undersigned finds that the ALJ improperly assessed Claimant's RFC due to this omission.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 13.) is **GRANTED** to the extent she prays for reversal of the Commissioner's decision, the Defendant's Motion for Judgment on the Pleadings (Document No. 15.) is **DENIED**, the final decision of the Commissioner is **REVERSED** and **REMANDED** back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order to consider whether Claimant's fibromyalgia is an impairment under the Regulations and to consider any limitations therefrom in the remaining steps in the sequential evaluation process. This matter is hereby **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to provide copies of this Order to all counsel of record.

ENTER: January 19, 2017.

Omar J. Aboulhosn
United States Magistrate Judge